**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

|  |  |
|---|---|
| THE TRAVELERS INDEMNITY COMPANY,<br>              Plaintiff, | |
| v. | CAUSE NO.: 4:17-CV-86-TLS |
| BRITTANY M. JOHNSON,<br>              Defendant. | |
| BRITTANY M. JOHNSON,<br>              Counter-Claimant, | |
| v. | |
| THE TRAVELERS INDEMNITY COMPANY,<br>              Counter-Defendant. | |

**OPINION AND ORDER**

On April 27, 2008, Brittany M. Johnson suffered serious and permanent injuries in a vehicular collision involving a semi-truck driven by Kimiel Horn, an employee of Sandberg Trucking, Inc. Johnson sued Horn and Sandberg Trucking in state court. The jury returned a verdict of $7,100,000 and assessed Horn's fault at 30%, resulting in a verdict against Horn and Sandberg Trucking of $2,130,000. Both were insured by The Travelers Indemnity Company (Travelers) with a $1,000,000 policy limit. Sandberg Trucking's liability was capped at the $1,000,000 policy limit pursuant to an agreement in its bankruptcy proceedings. Horn assigned to Johnson his right to sue Travelers in relation to the excess verdict of $1,130,000 against him.

This matter is now before the Court on the parties' cross motions for summary judgment, ECF Nos. 89, 90, on whether Travelers breached its duty to deal in good faith with Horn, its insured, by not settling for the $1,000,000 policy limit prior to the jury verdict in light of the risk to Horn of an excess verdict. For the reasons stated below, the Court denies both motions.

## PROCEDURAL BACKGROUND

On November 2, 2017, Travelers filed a one-count Complaint [ECF No. 1] against Johnson, seeking a declaratory judgment that Travelers owes no more than the $1,000,000 policy limits to Johnson for her claim in the underlying lawsuit. Compl. 5–6, ECF No. 1. On December 21, 2017, Johnson filed an Answer and Counterclaim [ECF No. 19]. The Counterclaim seeks a declaration that Travelers owes Johnson the entirety of the judgment entered against Horn (Count I) and brings claims of negligent failure to settle (Count II), bad faith failure to settle (Count III), and breach of contract (Count IV). Answer & Countercl. 16–21, ECF No. 19. On Travelers' motion, the Court dismissed the negligent failure to settle claim. *See* Feb. 18, 2020 Op. & Order, ECF No. 63.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [the non-movant's] case on which [the non-movant] bears the burden of proof; if [the non-movant] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). With cross-motions for summary judgment, the Court must construe all facts in a light most favorable to the party against whom the motion under consideration is made. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). A court's role "is not to sift through the evidence,

2

pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## ADMISSIBILITY OF KAUFMAN'S EXPERT OPINION

Travelers challenges the admissibility of the case valuation opinion given by Susan Kaufman, Johnson's claims handling expert. Kaufman opined that "an honest and fair evaluation of [Johnson's] damages should have resulted in a range of [$5,000,000 to $10,000,000] or more." Def. Ex. O, 13, ECF No. 88-16. The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013). Under that standard, courts apply a three-step analysis, asking whether: (1) "the witness is qualified"; (2) "the expert's methodology is scientifically reliable"; and (3) "the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted). Travelers contends that Kaufman is not qualified and that she failed to use an objective methodology. The Court overrules Travelers' objection.

First, an expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Travelers argues that Kaufman is not qualified because she is not an attorney and has never handled an insurance claim in Indiana. Travelers ignores that Kaufman has worked in the insurance industry for 32 years, including 20 years for Travelers in claims handling. Def. Ex. O, 1; Def. Ex. Q, 121:21–23, ECF No. 88-18. As director of legal claims, Kaufman evaluated Travelers' conduct for consistency with good faith standards, reviewing files for which policy limits were offered and rejected. Def. Ex. Q, 122:1–19. If Travelers acted

3

inconsistently with industry standards, she evaluated the full damages and entered into negotiations to resolve the claim to include extra-contractual monies. *Id.* at 122:20–123:3. The Court finds that Kaufman is qualified to render her case valuation opinion.

Second, a court need not admit a qualified expert's opinion if it is "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In arguing that Kaufman used no objective methodology, Travelers cites Kaufman's testimony that case valuation is not an "exact science." Pl. Ex. N, 28:22–29:14, ECF No. 91-14. Yet, Kaufman explained that valuing potential damages is based on information that is or should be available and that evaluating comparative fault is based on years of training and experience. *Id.* at 29:3–14. Travelers also criticizes that Kaufman reviewed no jury verdicts to value the case. *Id.* at 102:15–20. Kaufman explained that jury verdicts are "not reflective of a fair and reasonable evaluation of a claim" and that relying on jury verdicts is not how claims should be evaluated. *Id*. at 102:22–103:5. For most of her career, Kaufman handled moderate to very large cases, evaluated thousands of cases herself as well as thousands initially evaluated by others, and reviewed claim files all over the country for ten years as an expert. *Id.* at 34:14–19; 99:23–100:3. In this case, she reviewed Travelers' file and worksheets, defense counsel's pretrial report, medical reports, depositions, and court documents. *Id.* at 121:2–11. The Court finds that Kaufman's damages valuation is based on sufficient and reliable methodology as well as known facts. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

## MATERIAL FACTS

### A.    The Collision and Johnson's Injuries

On April 27, 2008, Johnson was involved in a vehicular collision with a truck operated by Horn and owned by Sandberg Trucking, Inc. Compl. ¶ 8. Johnson was the passenger in the

vehicle, and the driver was pronounced dead at the scene. Answer to Countercl. ¶¶ 18, 19, ECF No. 23. In the underlying state action, Johnson alleged that Horn, having pulled onto the shoulder of Interstate 65 after hitting a deer, failed to use his emergency flashers, warning triangles, and road flares to warn of his stopped semi-truck and the deer carcass in the roadway. Compl. Ex. B, ¶ 5, ECF No. 1-2. This allegedly caused Johnson's vehicle to swerve to avoid hitting the deer and then collide with the rear of the semi-tractor/trailer. *Id.* Johnson was 22 years old at the time of the crash with a life expectancy to the age of 82 years old. Answer to Countercl. ¶ 17. As a result of the crash, Johnson suffered a severe traumatic brain injury that affected her memory, balance, and behavior; multiple skull fractures; removal of her spleen; multiple fractured ribs; permanent facial palsy and scarring across her forehead; deafness in her left ear; and seizures. *Id.* at ¶ 16.

**B.      Travelers Insurance Policy**

Sandberg Trucking had a $1,000,000 policy of insurance with Travelers, and both Sandberg Trucking and Horn, its employee, were insured under the policy. Compl. Ex. A, ECF No. 1-1; Def. Ex. D, 42:16–21, ECF No. 88-5.

**C.      The Underlying Litigation, Sandberg Trucking's Bankruptcy, and Johnson's Settlement Demands**

On September 26, 2008, Sandberg Trucking filed for bankruptcy. Compl. Ex. C, 5, ECF No. 1-3. On July 23, 2009, Johnson filed a lawsuit in state court against Sandberg Trucking and Horn, seeking damages for the injuries she suffered in the collision. *Id.* Travelers provided a defense to Sandberg Trucking and Horn. Pl. Resp. 2, ECF No. 95. Travelers assigned Mark Miner as claims adjustor and initially assigned staff attorney Paul Belch as defense counsel. Pl.

Ex. B, 4:11–23, 67:9–13, ECF No. 91-2. The litigation was stayed as a result of Sandberg

Trucking's bankruptcy.

On August 21, 2009, Attorney Belch assessed comparative fault of Sandberg Trucking

and Horn at 10%; he did not assess likely damages. Pl. Ex. C, 4, ECF No. 91-3.

On October 23, 2009, Travelers sent a letter to Horn, confirming that Attorney Belch was

representing him in the litigation. The letter included:

> This suit seeks an unspecified amount. The above captioned primary auto policy
> contains a combined single limit of liability in the amount of $1,000,000. We call
> to your attention the fact that it is possible for a judgment in this case to be obtained
> in excess of the above captioned policy limit.
>
> Therefore, you may, at your own expense, wish to hire separate counsel to protect
> you for any uninsured interests that you may have in this matter.

Pl. Ex. P, 1–2, ECF No. 95-16.

On January 3, 2011, Attorney Belch assessed the jury verdict range at $750,000–

$800,000 and recommended a settlement value of $75,000 when accounting for comparative

fault. Pl. Ex. D, 5, 6, ECF No. 91-4. On March 11, 2011, Johnson made a settlement demand for

"$5,321,432.64 and in the event your policy limits are less, please construe this as a demand for

your policy limits." Def. Ex. L, 4, ECF No. 88-13. On March 22, 2011, Attorney Belch reiterated

his recommendation of a $75,000 settlement value. Pl. Ex. E, 1, ECF No. 91-5.

On June 23, 2011, Attorney Belch noted in Travelers' file that "Sandberg Trucking will

be dissolved once the bankruptcy clears. This means if there is an excess verdict, they wouldn't

be able to collect from the [insured] company." Def. Ex. P, 3, ECF No. 88-17. He also wrote

that, "[s]ince the [insured] driver is a named defendant, then [plaintiff] could potentially collect

from the [insured] driver if there was an excess verdict. It's something to keep in mind." *Id.*

On March 27, 2012, Johnson filed a motion in the bankruptcy proceeding to lift the

automatic stay, representing that she will not look to the assets of Sandberg Trucking to satisfy a

judgment in the state action. Compl. Ex. C, 7, ¶ 7. On April 20, 2012, the bankruptcy court lifted

the stay to permit Johnson to continue her claim against Sandberg Trucking, noting that Johnson

"has agreed to proceed against solely the insurance available." Compl. Ex. D, ECF No. 1-4.

On January 22, 2013, Travelers' claims adjuster Mark Miner completed a "Bodily Injury

Worksheet," which he continuously updated through trial. *See* Pl. Ex. K, ECF No. 91-11. On that

date, Miner estimated the "Full Injury Value" of Johnson's claim at $800,000, Horn's

comparative fault at 10%, and a case settlement value of $80,000. *Id*. at 4.

On March 27, 2013, Attorney Robert Foos, to whom Travelers had reassigned the

defense, wrote to Miner: "As you know, the demand is currently over $5,000,000. However,

when they applied to lift the stay in the bankruptcy court they agreed not to pursue any assets

outside the policy of insurance. Therefore they are confined to seeking the $1,000,000 policy

limits." Pl. Ex. G, 1, ECF No. 91-7. Attorney Foos valued the case at $600,000 to $700,000

without regard to liability. *Id*. Attorney Belch agreed with Attorney Foos' analysis. *Id*. On May

21, 2013, Miner wrote in the Bodily Injury Worksheet that staff counsel initially involved in the

claim had "backed out of case due to possible excess exposure." Def. Ex. F, 2, ECF No. 88-7.

On June 12, 2013, Johnson informed Travelers that, based on her age and the significance

of her injuries, she would seek more than $10,000,000 at trial and requested that Travelers tender

its policy limits of $1,000,000 to settle the claim. Def. Ex. G, 3, ECF No. 88-8.

On July 17, 2013, Miner contacted Attorney Foos to ask whether the $1,000,000 policy

limit cap also extends to the insured driver. Def. Ex. H, 1, ECF No. 88-9. Miner noted in the file

that Attorney Foos "confirmed that there is nothing in the bankruptcy agreement that indicates

that the cap on the policy limits extends to the driver." *Id.* Miner then wrote in the file notes:

> However, [Attorney Foos] is posturing the case to make a good argument that it
> does extend. He has filed a motion to dismiss the negligent entrustment, hiring and
> retention claims against our insured. If granted, this would mean there would only

> be one line on the verdict form for our insured and insured driver. If so, [Attorney
> Foos] believes we have a good argument that there is a cap of the policy limits. This
> wouldn't be decided/ruled upon until prior to trial via motion in limine.

*Id.*; *see also* Pl. Ex. A, 108:5–17, ECF No. 91-1. Miner also wrote:

> [Counsel] and I both agree that this is a scary case with a significant full damage
> value. The real concern is that the plaintiff is negligent free. We all agree that [the
> driver of the car] is more than 50% responsible however if plaintiff is able to prove
> 10% against our insured, that could potentially be a significant award.

Def. Ex. H, 2. Travelers responded to Johnson's demand letter with an offer of $75,000. *Id.*

In the November 20, 2013 update to the Bodily Injury Worksheet, Miner increased the

Full Injury Value of Johnson's injuries to $1,614,500. Pl. Ex. K, 21. With his estimate of Horn's

comparative fault still at 10%, Miner listed a settlement value of $161,450. *Id.* Under "Basic

Information," Miner noted: "Insured went into bankruptcy and as a result, the plaintiff cannot

seek any damages above the available policy limits of $1,000,000." *Id.* at 18. Yet, under "Special

Considerations" in the "Damages Evaluation" section, Miner also noted: "Insured filed

bankruptcy and plaintiff's counsel agreed not to pursue anything above the policy limits against

the insured *however it remains to be seen whether this will also hold true of the insured driver.*"

*Id.* at 21. Both notes remained in the Bodily Injury Worksheet updates through trial. *Id*. at 25–

174. Attorney Foos testified that, if Travelers' claim file says it believed there was a cap of

$1,000,000 in damages, he was not the one who so advised. Pl. Ex. A, 73:4–10. He also testified:

"I felt my obligation was to let them know that this is a potential excess verdict case, and then

they make the decision whether or not to settle within the policy limits." *Id.* at 89:13–16.

On January 9, 2014, Johnson renewed the demand for the policy limits. Def. Ex. L, 13.

On April 15, 2014, Johnson sent a letter memorializing the mediation offer to accept $990,000 in

settlement and noting Travelers' final offer of $100,000. *Id.* at 14.

On April 25, 2014, Miner lowered the Full Injury Value to $1,114,500 but increased Horn's comparative fault to 25% for a settlement value of $278,625. Pl. Ex. K, 29. These values remained the same until trial in February 2016. *See id.* at 29–136. When asked for any "specifics" for lowering the Full Injury Value, Miner testified:

> I believe I testified or talked about it earlier today with the Plaintiff's lack of ongoing medical treatment, the receipt of medical documentation which showed that she was released and showed that she indicated she was doing fine, doing great. That she, her testimony in her deposition that she was raising a child without the benefit of a father. She was, had sought employment, found employment and doing activities of daily living. That sort of thing.

Pl. Ex. B, 172:22–173:8; *see also id.* at 138:23–139:5.

In a December 17, 2014 pretrial report, Attorney Foos opined that the case could return a verdict as high as $1,000,000 but he expected the verdict range to be $600,000 to $700,000. Pl. Ex. I, 6, ECF No. 91-9. He advised, "I have previously indicated a settlement value of between $150,000 [sic] and I think that is a good place for us to be right now." *Id.* at 7.

On January 12, 2015, Johnson's expert neurologist, Dr. Jonathan L. Liss, prepared a written report. Def. Ex. B, ECF No. 88-3. He identified Johnson's injuries sustained immediately in the crash as including multiple skull fractures, traumatic brain injury, rib fractures, facial nerve damage, vertebral fractures, hearing loss in the left ear, memory loss, and gait instability. *Id.* at 5. Dr. Liss identified delayed injuries as including epilepsy, nasal fracture, vertigo, and worsening hearing loss/tinnitus, opining that the epilepsy and hearing loss/tinnitus are permanent conditions. *Id.* at 6. Finally, he identified the following injuries that persisted: epilepsy; gait instability; pain syndromes; scars of the face, knee, and abdomen; depression and anxiety; vertigo; memory loss; and sleep dysfunction. *Id.* at 7–8.

On February 11, 2015, Johnson renewed her demand for the $1,000,000 policy limits. Def. Ex. L, 15. A week later, Attorney Foos sent a response, offering to settle for $150,000. *Id.* at 19. On May 29, 2015, Johnson renewed the demand for the policy limits. *Id.* at 20.

On November 9, 2015, Dr. Jeri Morris, Johnson's expert neuropsychologist, completed a neuropsychological evaluation. Def. Ex. C, ECF No. 88-4. In addition to reviewing medical records and Dr. Liss' opinion, Dr. Morris evaluated Johnson on October 19, 2015, administering a battery of intellectual and neuropsychological tests. *Id.* at 1–8. Dr. Morris' report details Johnson's injuries as well as Johnson's reports of ongoing problems regarding memory, sensitivity to noise, balance problems, insomnia, infections, and headaches. *Id.* at 4–5, 8. Dr. Morris concluded: "The results of the neuropsychological evaluation are consistent with diffuse bilateral cerebral impairment as a consequence of her accident on April 27, 2008." *Id.* at 8. After providing the details of specific impairments, Dr. Morris concluded, "Given the considerable magnitude and extent of her physical injuries, cognitive deficits, and personality changes as well as the time that has elapsed since her accident, no additional recovery can be expected." *Id.* at 9.

In late November 2015, Travelers' consulting expert indicated that he would have administered the same tests and would be surprised to find different results. Def. Ex. E, ECF No. 88-6; Def. Ex. T, ECF No. 88-21. The expert noted that the memory scores are "pretty low," there is no evidence of malingering, the scores for the cognitive impairment are consistent with the injury, and memory function and impulsivity are not expected to change. Def. Exs. E, T.

In a January 6, 2016 pretrial report, Attorney Foos reiterated a settlement value of between $100,000 and $150,000. Pl. Ex. A, 90:16–92:9. Attorney Foos wrote that "there is also a good argument to be made that the cap is $1 million given Plaintiff's execution of the motion to lift the bankruptcy stay in which [she] agreed not to pursue Sandberg for anything in excess of their policy limits." *Id*. at 105:2–9. At his deposition, Attorney Foos further explained what he

10

meant by a "good argument": "Well, my recollection is . . . that the Plaintiff filed . . . a motion to lift the stay, saying that they would not proceed against any of the assets of the Defendants but would proceed against the policy limits of their insurance." *Id.* at 105:12–21. Attorney Foos then testified, "Well, I think that I had told them previously that there was nothing specifically in there that would definitely protect Mr. Horn. I'm not saying either then in that report or in this report that it absolutely protects him; but yeah, based upon the representation that they were going to proceed against the policy limits that was the argument." *Id.* at 106:16–23.

On January 11, 2016, Johnson renewed her demand for the policy limits. Def. Ex. L, 22. Travelers rejected the demand and communicated its intent to go to trial. *Id.* at 23.

In valuing the claim, Miner reviewed, among other things, medical records, deposition transcripts, expert reports, and reports from counsel for Sandberg Trucking and Horn. Pl. Ex. J, ¶ 2, ECF No. 91-10. The Bodily Injury Worksheet shows that Miner considered descriptions of injuries, developments in litigation, summaries of expert opinions, and assessments of comparative fault. *See* Pl. Ex. K. Miner testified that his review included Johnson telling a treating physician at least one year after the accident "that she was feeling fine, feeling great. She was able to seek employment. She was able to live basically on her own, complete activities of daily living . . . ." Pl. Ex. B, 120:1–12. Miner testified that he did not evaluate the claim based on a limit or a cap. *Id.* at 17:16–18. Miner testified that "Travelers always puts the interests of [its] insureds first and foremost" and that the policy limits do not play a role in the fair valuation of a claim. *Id.* at 8:19–9:1, 15:16–16:4.

Miner testified that Travelers did not weigh the risk to Horn of going to trial because they believed that the bankruptcy agreement limiting the Plaintiff to the policy limits against Sandberg Trucking applied to Horn. *See* Def. Ex. D, 48:18–51:4, 103:1–8. Miner believed the case was capped at $1,000,000. *Id.* at 49:4–6. Miner testified, "[Horn] was covered under the

policy. And if the policy is capped at $1 million, then that [risk to Horn] didn't play into the evaluation." *Id.* at 51:5–11.

### D.    Jury Trial and Verdict

Attorney Foos testified that the "trial was about proximate cause more so than about negligence." Pl. Ex. A, 43:8–9, 50:18–22. Miner testified that Travelers believed that Horn had acted reasonably and was not the proximate cause of the accident. Pl. Ex. B, 55:13–16, 93:2–8. Miner attended the trial. *Id.* at 175:4–7. On February 26, 2016, the jury returned a verdict of $7,100,000 in favor of Johnson and assessed Sandberg Trucking and Horn's fault at 30%. Def. Ex. N, ECF No. 88-15. A $2,130,000 verdict was entered against Sandberg Trucking and Horn. *Id.* On June 12, 2017, Travelers tendered to Johnson a $1,000,000 check for the policy limits and a check for statutory interest. Answer ¶ 21, ECF No. 19. On October 13, 2017, Horn assigned to Johnson his right to recover the excess verdict of $1,130,000 plus post-judgment interest. Compl. Ex. H, ECF No. 1-8.

### E.    Communication of Settlement Offers to Horn

Horn testified that he was not advised of any of Johnson's settlement offers and that nobody had explained to him that Johnson had offered to settle for the policy limits and that such a settlement would have protected his assets. Def. Ex. M, 27:20–28:3, 31:9–14, 33:12–22, ECF No. 88-14. Miner was not aware of anyone from Travelers conveying Johnson's settlement demands to Horn. Def. Ex. D, 78:20–79:3, 105:21–106:1. However, Attorney Foos testified that he advised Horn of the settlement offers, the risk of an excess verdict, and the policy limits and that Horn knew the policy limits before the trial. Pl. Ex. A, 54:19–21, 56:5–12, 62:13–23.

### F.    Johnson's Claims Handling Expert, Susan Kaufman

As noted above, Johnson's claims handling expert, Susan Kaufman, opined that "an honest and fair evaluation of [Johnson's] damages should have resulted in a range of [$5,000,000

to $10,000,000] or more." Def. Ex. O, 13. When asked if she saw "any indication that . . . anyone

at Travelers actually expected the verdict to exceed $1 million," Kaufman responded, "I didn't

see any evidence that Travelers expected the verdict to exceed $1 million because Travelers did

not fairly and honestly or legitimately evaluate the damages aspect of the claim." Pl. Ex. N,

50:19–51:2, 51:3–12. She opined that Travelers made a "grossly insufficient evaluation of

damages." *Id.* at 95:15–20. Kaufman testified that what was "most disturbing" to her was that

Travelers did not change its damages evaluation after Dr. Liss' January 2015 report, after losing

its motion for summary judgment, or after Dr. Morris' report in November 2015, even though

those were "three very significant bits of new information that they received." *Id.* at 67:11–21.

Based on her review of Travelers' file and worksheets, Attorney Foos' pretrial reports, medical

reports, depositions, and court documents, Kaufman opined that Travelers did not have a

legitimate, principled, reasonable basis for its evaluation of the case. *Id.* at 121:2–11.

## ANALYSIS

The jury returned a $7,100,000 verdict in favor of Johnson and assessed Horn's liability

at 30%, resulting in a $2,130,000 judgment against Horn and Sandberg Trucking. After Travelers

paid Johnson the $1,000,000 policy limits, Horn remained liable for the $1,130,000 excess

verdict. At issue on the parties' cross motions for summary judgment is whether Travelers

breached its duty to deal in good faith with Horn, its insured, by failing to settle for the

$1,000,000 policy limits resulting in the excess verdict against Horn.

In Indiana, an insurer has an implied duty to "deal in good faith with its insured," and the

Indiana Supreme Court has recognized a cause of action in tort for the breach of that duty. *Erie*

*Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). This duty of good faith "includes the

obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing

an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair

13

advantage to pressure an insured into a settlement of his claim." *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005) (quoting *Erie Ins. Co.*, 622 N.E.2d at 519).

Moreover, Indiana law recognizes an insurer's duty of good faith to settle a claim to avoid an excess judgment against its insured. *See Econ. Fire & Cas. Co. v. Collins*, 643 N.E.2d 382, 384–85 (Ind. Ct. App. 1994); *Pistalo v. Progressive Cas. Ins. Co.*, 983 N.E.2d 152, 158 (Ind. Ct. App. 2012) ("Included in that good faith obligation was [the insurer's] duty to avoid exposing [the insured's] estate to excess liability by refusing to settle for the policy limits."); *Woodruff v. Am. Fam. Mut. Ins. Co.*, No. 1:12-CV-859, 2014 WL 1775965, at *4–5 (S.D. Ind. May 5, 2014) (considering a claim for breach of the duty of good faith based on the insurer's decision not to settle that resulted in an excess judgment against the insured); *see also Certain Underwriters of Lloyd's v. Gen. Accident Ins. Co. of Am.*, 909 F.2d 228, 231–32 (7th Cir. 1990) (explaining that the duty arises "from the conflict of interest between the insured and the insurer when the insured's potential liability exceeds the policy limits").

"Absent a duty of good faith, the insurer might consider only its own monetary interests in deciding whether or not to settle a third party's claim, ignoring the risk of an excess verdict on the insured." *Collins*, 643 N.E.2d at 386 (citing *Certain Underwriters*, 909 F.2d at 232). This settlement duty requires the insurer "to view the situation as if there were no policy limits applicable to the claim, and to give equal consideration to the financial exposure of the insured." *Certain Underwriters*, 909 F.2d at 231–32. "[A]n insurer may be held liable for the entire excess judgment in instances of bad faith." *Collins*, 643 N.E.2d at 385.

Generally, "the lack of diligent investigation alone is not sufficient to support" a finding of bad faith. *Erie Ins. Co.*, 622 N.E.2d at 520. Nor will "a good faith dispute about the amount of a valid claim or about whether the insured has a valid claim" be sufficient. *Id*. However, "an insurer which denies liability knowing that there is no rational, principled basis for doing so has

14

breached its duty." *Id.* This requires "showing more than bad judgment or negligence." *Smith v. Progressive Se. Ins. Co.*, 150 N.E.3d 192, 203 (Ind. Ct. App. 2020); *see also Berry Plastics Corp. v. Ill. Nat'l Ins. Co.*, 244 F. Supp. 3d 839, 852 (S.D. Ind. 2017) (quoting *Colley v. Ind. Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998)), *aff'd*, 903 F.3d 630 (7th Cir. 2018). Thus, "a finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Monroe Guar. Ins. Co.*, 829 N.E.2d at 977 (quoting *Colley*, 691 N.E.2d at 1261).

On her motion for partial summary judgment, Johnson argues that there is no question of fact that Travelers breached its duty of good faith when it put its financial interests above Horn's by knowingly undervaluing the claim and by evaluating the claim based on the $1,000,000 policy limits. Johnson asks for judgment in her favor on the bad faith claim in the amount of the $1,130,000 excess verdict, leaving the claim for punitive damages to the jury. On its cross motion, Travelers argues that it is entitled to summary judgment on the bad faith claim and the request for punitive damages because there is no evidence that Travelers knew of and disregarded the risk of an excess verdict to Horn. As set forth below, the Court finds that disputes of fact regarding the claim value and the risk of an excess verdict to Horn preclude summary judgment.

## A.    Bad Faith Failure to Settle for Policy Limits, Resulting in Excess Verdict to Insured

The first issue is whether Travelers had a rational, principled basis for its full claim valuation of $1,114,500, which resulted in a settlement value of $278,625 based on Travelers' estimate of Horn's liability at 25%.

Johnson contends that Travelers breached its duty of good faith by failing to fairly, honestly, and reasonably evaluate Johnson's damages and, thus, grossly undervalued her claim at $1,114,500. Johnson argues that Miner's valuation was not tied to the evidence of record as she

15

suffered serious and permanent injuries in the collision, including a severe traumatic brain injury that affected her memory, balance, and behavior; multiple skull fractures; removal of her spleen; multiple fractured ribs; permanent facial palsy and scarring across her forehead; deafness in her left ear; and seizures. She was 22 at the time of the accident with a life expectancy to the age of 82. Miner was aware of her injuries from the outset of the litigation yet initially assessed damages at only $800,000. In July 2013, Miner and Attorney Foos "agree[d] that this is a scary case with a significant full damage value" and that, even if Johnson "is able to prove 10% against our insured, that could potentially be a significant award." While Miner increased that valuation to $1,614,500 on November 20, 2013, Johnson argues that he inexplicably reduced the valuation to $1,114,500 on April 24, 2014, which then remained unchanged.

In contrast with Travelers' valuation, Susan Kaufman, Johnson's claims adjustment expert, opined that the total value of Johnson's damages should have been estimated in the $5,000,000–$10,000,000 range. Based on a review of Travelers' file and worksheets, Attorney Foos' pretrial reports, medical reports, depositions, and court documents, Kaufman opined that Travelers did not have a legitimate, principled, or reasonable basis for its low valuation of the case.

More importantly, Johnson argues that Travelers has offered no rational, principled basis for failing to adjust the damages value of $1,114,500 after receiving the expert opinions of neurologist Dr. Liss in January 2015 and neuropsychologist Dr. Morris in November 2015, both of whom opined as to her severe and permanent injuries set forth in detail in the Background above. Johnson notes that Travelers' consulting expert agreed with Dr. Morris' report of a permanent impairment. Nor did Miner adjust the valuation after Travelers lost its motion for summary judgment on proximate causation. Kaufman found it inexplicable that Travelers did not revise its damages assessment after these developments.

As early as March 2011, Johnson made a settlement demand for $5.3 million but offered to settle for the policy limits. Miner knew in June 2013 that Johnson would seek $10,000,000 at trial but that she was still willing to settle for the $1,000,000 policy limits. Johnson made the policy limits demand at least seven times, including on February 15, 2015, after Dr. Liss' expert report, and on January 11, 2016, which was both after Dr. Morris' expert report and shortly before the February 2016 trial. Johnson notes that the highest settlement offer made by Travelers was $150,000 on a claim for which the jury valued Horn's liability at $2,130,000.

Johnson argues that the reasonable inference that can be drawn from Travelers' failure to properly assess the value of the claim, including the failure to reassess the value based on significant developments, is that Travelers elevated its own financial interests over those of Horn. *See Certain Underwriters*, 909 F.2d at 231–32 (recognizing "the conflict of interest between the insured and the insurer when the insured's potential liability exceeds the policy limits"); *Nelson v. Jimison*, 634 N.E.2d 509, 512–13 (Ind. Ct. App. 1994) (finding an issue of fact for the jury on breach of duty of good faith, when the insurer failed to settle for over five years and ultimately conceded the higher value of the insured's claim, in part, because the insured provided "two expert opinions to the effect that there was no reasonable basis for [the insurer's] dispute of the value of [the insured's] claim and the delay made in payment").

In response and on its own motion for summary judgment, Travelers argues that this is nothing more than a good faith dispute about the value of Johnson's damages, which cannot sustain a bad faith claim. Travelers reasons that Miner's final full claim value of $1,114,500 and settlement value of $278,625 were reasonable. In support, Travelers references generally that Miner considered multiple reports from defense counsel, reviewed deposition transcripts, reviewed expert reports, attended the trial, and documented his process in the Bodily Injury Worksheet. As an explanation for reducing the valuation in April 2014 by $500,000, Travelers

notes Miner's reliance on Johnson's report to her physicians a year after the accident that "she was feeling fine, feeling great. She was able to seek employment. She was able to live basically on her own, complete activities of daily living . . . ." And, Travelers argues that Miner's valuation was consistent with the valuation by Attorney Foos, who never suggested a settlement value of greater than $150,000.

Conspicuously absent from the analysis in Travelers' briefs is any acknowledgement of the severe and permanent nature of Johnson's injuries, her age and life expectancy, the specific findings of Dr. Liss' and Dr. Morris' expert reports, or that Travelers' own consulting expert agreed with Dr. Morris' report. Moreover, Travelers offers no explanation of how, if at all, Miner accounted for the expert opinions of permanent injuries when assessing the full damages value of the claim. Notably, Travelers does not respond to Johnson's assertion that Miner's failure to reassess the claim value is evidence of Travelers' bad faith failure to settle.

Rather, Travelers argues that the fact Miner and Attorney Foos were ultimately incorrect in their valuation is insufficient, by itself, to show bad faith. Here, however, whether Miner's explanation for his final valuation of $1,114,500 on April 24, 2014, with no adjustment following future significant developments, had a rational, principled basis is a matter for the jury to determine. *See Nelson*, 634 N.E.2d at 513 ("[W]hether these explanations are reasonable or not depends upon matters that the jury must decide, including witness credibility."); *Gooch v. State Farm Mut. Auto. Ins. Co.*, 712 N.E.2d 38, 41 (Ind. Ct. App. 1999) (finding, on a bad faith claim, that "a final determination of the significance of all of the evidence presented by [the insured] is a question for the jury" regarding whether the insurer's conduct was intentional based on its knowledge).

The second issue is whether Travelers had a rational, principled basis for proceeding as if Horn's liability was capped at $1,000,000 based on the bankruptcy agreement to cap Sandberg Trucking's liability at the $1,000,000 policy limits.

Johnson contends that Travelers acted on a belief that Horn's liability was capped at $1,000,000; that Travelers had no rational, principled basis for this belief; that Travelers knew that Horn's liability was not capped by the bankruptcy agreement; and that Travelers knowingly put Horn at risk of an excess verdict as a result. As early as June 2011, Attorney Belch warned Travelers of the possibility of an excess verdict against Horn. In May 2013, Miner noted a change of counsel because of the possibility of an excess verdict. In July 2013, after the bankruptcy stay was lifted and Johnson agreed not to pursue damages against Sandberg Trucking in excess of the $1,000,000 policy limits, Miner reached out to Attorney Foos to specifically ask if that damages cap also applied to Horn. Miner documented Attorney Foos' response that nothing in the bankruptcy agreement indicated that the cap applied to Horn. Miner also noted Attorney Foos' proposed litigation strategy to reason that the cap applies to Horn; but that was only a strategy. In November 2013, Miner noted in the Bodily Injury Worksheet: "Insured filed bankruptcy and plaintiff's counsel agreed not to pursue anything above the policy limits against the insured *however it remains to be seen whether this will also hold true of the insured driver*." Johnson reasons that the reasonable inference is that Travelers was willing to go to trial in hopes of a verdict below the policy limits, putting its own financial interests above the known risk to Horn of an excess verdict.

In contrast, Travelers argues that it believed Horn's liability was capped at $1,000,000 based on Attorney Foos' advice and, thus, that it could not have knowingly ignored the risk to Horn. Miner testified to the belief that the bankruptcy agreement to cap Sandberg Trucking's liability at the $1,000,000 policy limits applied to Horn. Miner also explained that Travelers

19

relied on Attorney Foos' litigation strategy that, if Sandberg Trucking and Horn were on the same line of the verdict form, there would be an argument that Horn would also benefit from the bankruptcy agreement to cap Sandberg Trucking's damages. Travelers argues that it was reasonable to rely on that advice. Travelers also notes the statement in the Bodily Injury Worksheet: "Insured went into bankruptcy and as a result, the plaintiff cannot seek any damages above the available policy limits of $1,000,000." However, Travelers ignores the statement in the same worksheet, quoted above, that it was "yet to be seen" if the agreement would apply to Horn. It is for the jury to determine whether it was reasonable for Travelers to risk that strategy at trial, knowing that Horn would be subject to an excess verdict if the strategy was unsuccessful. Thus, there are questions of fact whether Travelers had a rational, principled basis for acting as if the $1,000,000 cap on Sandberg Trucking's liability also protected Horn from the risk of an excess verdict.

Finally, Johnson argues that Travelers' failure to advise Horn of her demands to settle for the $1,000,000 policy limits and failure to explain that such a settlement would have protected his assets are further evidence of Travelers' bad faith in failing to settle for the policy limits. In response, Travelers cites Attorney Foos' testimony that he advised Horn of the settlement offers and the risk of an excess verdict. Thus, whether Horn was advised of Johnson's settlement offers is a disputed issue of fact. Travelers also points to its 2009 letter, shortly after it accepted the defense, warning Horn of the risk of an excess verdict and advising that he may want to retain his own attorney. But there is no evidence that Travelers subsequently conveyed to Horn the necessary information for him to protect his interests as the case developed. *See, e.g.*, *McKinley v. Guar. Nat'l Ins. Co.*, 159 P.3d 884, 889 (Idaho 2007) (explaining that "[f]ailing to inform the insured of any settlement offers does not make the insurance company liable for bad faith in and of itself [but] it is one factor to be considered"). The issue is material because a failure to

communicate Johnson's settlement offers for the $1,000,000 policy limits may suggest a furtive design or improper purpose in relation to Travelers' conduct and whether Travelers knowingly ignored the risk of excess liability to Horn in favor of its own financial interests.

Although an insurer has an interest in supervising the defense against a covered claim and negotiating a settlement because of the insurer's financial liability, "the insurer is forbidden to 'sell out' an insured." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Mead Johnson & Co.*, 735 F.3d 539, 543 (7th Cir. 2013); *see Woodruff*, 2014 WL 1775965, at *5 (agreeing that, although insurance companies have the right to assert a good faith defense to liability, including the right to fail in the defense, "insurers should not have an unfettered right to 'gamble' with insureds' money"). As a result, the excess judgment of $1,130,000 entered against Horn is part of the risk Travelers took when it chose not to settle for the policy limits offered by Johnson. *See Pistalo*, 983 N.E.2d at 160. If the jury finds that Travelers knowingly took that gamble and lost, Travelers is liable for the excess verdict entered against Horn.

Travelers maintains that it has a right to be wrong. But, this is true only if Travelers had a rational, principled basis for being wrong. *See HMV Indy I, LLC v. HSB Specialty Ins. Co.*, 413 F. Supp. 3d 801, 806 (S.D. Ind. 2019) ("In other words, it is the insurance company's knowledge that it lacks a rational, principled basis for its denial that gives rise to a bad faith claim, not whether its decision was ultimately right or wrong."). In this case, the question is not simply whether Travelers was incorrect in its assessments but whether it knowingly ignored information—both the full value of the claim as well as the fact that Horn's liability was not capped at $1,000,000—such that Travelers knew it lacked a rational, principled basis for refusing to settle for the policy limits in light of Horn's exposure to an excess verdict.

In summary, on Travelers' motion for summary judgment, Johnson has shown that a jury could draw reasonable inferences from the facts to find that the failure to settle for the

$1,000,000 policy limits lacked a rational, principled basis in light of Travelers' knowledge of the high full damages value of Johnson's claim and Travelers' knowledge that Horn was not protected by the bankruptcy agreement to cap Sandberg Trucking's liability at the $1,000,000 policy limit. A reasonable jury could find a breach of the duty of good faith when Travelers placed its financial interests above those of Horn and knowingly gambled with Horn's risk of an excess verdict. On Johnson's motion for summary judgment, Travelers has offered enough evidence to create a dispute of fact that it had a rational, principled basis for not settling for the full policy limits. Travelers has identified the basis of Miner's assessment of the full damages value, the consistency of Miner's assessment with those of Attorneys Belch and Foos, evidence of its belief that Horn's damages were capped by the bankruptcy agreement based on Attorney Foos' litigation strategy, and evidence that it communicated the settlement demands to Horn.

Accordingly, the Court denies the parties' cross motions on Johnson's counterclaim for bad faith failure to settle.

## B.    Punitive Damages

Travelers seeks summary judgment on Johnson's request for punitive damages on this bad faith counterclaim. In *Erie Insurance Co.*, the Indiana Supreme Court reaffirmed the applicable standard for punitive damages for the commission of a tort:

> Punitive damages may be awarded only if there is clear and convincing evidence that the defendant "acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing, in the sum [that the jury believes] will serve to punish the defendant and to deter it and others from like conduct in the future."

622 N.E.2d at 520 (citation omitted). Travelers argues generally in a brief statement that there is no evidence that its conduct meets this standard.

Johnson responds that there is a question of fact whether Travelers was grossly negligent in handling and evaluating Johnson's claim against Horn. "The Indiana Supreme Court has defined gross negligence as '[a] conscious, voluntary act or omission in reckless disregard of . . . the consequences to another party.'" *McGowen v. Montes*, 152 N.E.3d 654, 660–61 (Ind. Ct. App. 2020) (quoting *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003)), *transfer denied*, 166 N.E.3d 904 (Ind. 2021). "[T]he question of whether an act or omission constitutes gross negligence is generally a question of fact, [but] the question may become one of law if 'the facts are undisputed and only a single inference can be drawn from those facts.'" *Id.* (quoting *Miller v. Ind. Dep't of Workforce Dev.*, 878 N.E.2d 346, 356 (Ind. Ct. App. 2007)).

Johnson argues that there is evidence that Travelers put its monetary interests above those of its insured, Horn, because Travelers believed that the damages against Horn were capped at $1,000,000 based on a bankruptcy that did not apply to Horn. Johnson argues that there was no legal or rational basis for this belief because Attorney Foos advised that Horn was not protected by the bankruptcy agreement. Johnson also cites the lack of any rational, principled basis for the low case valuation and Travelers' failure to apprise Horn of Johnson's settlement offers. In reply, Travelers asserts that this is nothing more than a recitation of Johnson's bad faith arguments. Because multiple inferences can be drawn from the facts regarding Travelers' knowledge about the risk of a large damages award and the inapplicability of the bankruptcy agreement to Horn, the issue of gross negligence is for the jury. The Court denies Travelers' motion for summary judgment on the issue of punitive damages.

## CONCLUSION

For the reasons stated above, the Court hereby DENIES Brittany M. Johnson's Motion for Summary Judgment [ECF No. 89], DENIES The Travelers Indemnity Company's Motion for

Summary Judgment [ECF No. 90], and DENIES as moot the Motions for Ruling [ECF Nos. 99, 100]. This matter will be set for a scheduling conference by separate order.

SO ORDERED on May 5, 2022.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT